Elmer ATKINS et al., Appellants,

v.

T. M. GRAVES, Individually and as Next Friend of Bradley Graves, a Minor, Appellees.

No. 16416.

Court of Civil Appeals of Texas.

Fort Worth.

April 19, 1963.

Rehearing Denied May 10, 1963.

Kelly, Morris & Walker and Jearl Walker, Fort Worth, for appellants.

Harris & Ball, and Chester Ball, Arlington, for appellees.

MASSEY, Chief Justice.

From a judgment for plaintiff, individually and as next friend for his minor son Bradley Graves, defendants Atkins and his driver have appealed.

Judgment reversed and cause remanded for another trial.

At the outset we are confronted with Graves' motion to dismiss the appeal. Foundation of the contention that the appeal should be dismissed lies in Texas Rules of Civil Procedure, rule 329b, "District and County Court Cases", as amended effective January 1, 1961. Prior to the effective date of the amendment subdivision 3 of Rule 329b read as follows: "3. All motions and amended motions for new trial must be determined within not exceeding forty-five (45) days after the original or amended motion is filed, unless by written agreement of the parties in the case, the decision of the motion is postponed to a later date."

As amended subdivision 3 of Rule 329b reads as follows: "3. All motions and amended motions for new trial must be determined within not exceeding forty-five (45) days after the original or amended motion is filed, unless by one or more successive written agreements of the parties in the case filed with the clerk of the court the decision of the motion is postponed to a day certain specifically set out in any such agreement. Any such day certain shall not be more than ninety (90) days after such original or amended motion is filed."

In the instant case the parties entered into a written agreement, filed with the clerk of the court, reading as follows: (The parties) " * * * acting under the authority provided by subdivisions 3 and 4 of Rule 329–b, Texas Rules of Civil Procedure, as promulgated and amended by the Supreme Court of Texas, agree that the Defendants' Original Motion For New Trial, filed on April 26, 1962, in the above cause in behalf of the Defendants, may be presented, hearings held thereon, and same *may be determined by the trial court at any time up to and including the 15th day of July, 1962."* (Emphasis supplied.)

Two hearings on the motion for new trial took place during the month of June, 1962. On July 11, 1962, the judge rendered and signed an order overruling the motion. It

is observable that such determination of the motion was made 4 days prior to July 15, 1962, the date mentioned in the parties' written agreement. Steps taken to perfect the appeal were pursuant to a "time table" based upon the date of July 11, 1962, when the motion for new trial was overruled. The appellate "steps" were timely if such was proper to be done. Except for the propriety so to do the record in the case would not have been filed in this court in time and we would not have acquired jurisdiction. It is the contention of Graves' motion to dismiss the appeal that the agreement was a nullity because it was not in compliance with provisions of the rule (T. R.C.P. 329b) and that the motion should have been treated as one overruled by operation of law at a much earlier date, calculation from which day would demonstrate that the record was not filed in time and this court never acquired jurisdiction. A dismissal of the attempted appeal would be the only proper order to be entered in the case if Graves' interpretation is correct.

■ We have no precedent since amendment of the Rule. This is evidently the first expression of opinion by an appellate court on the Rule as amended in connection with the question presented. There is no doubt but that the Rule is mandatory and controlling of appellate jurisdiction. Yet we must remember that under both statutes and Rules regulating appeals, a record before the court will be liberally construed in favor of the right of appeal. Hunt v. Wichita County Water Improvement Dist. No. 2, 1948, 147 Tex. 47, 211 S.W.2d 743.

■ As applied to the circumstances in this case we construe the intent and provisions of the rule relative to "a day certain" to mean the last day on or before which the party may agree that a motion for new trial may be affirmatively acted upon, or be treated as the day on which it would be overruled by operation of law.

■ Under such construction appellate "steps" in perfecting the appeal before us were timely and our jurisdiction properly invoked. Although not material to the decision, note should be taken of the provisions in subdivision 4 (of Rule 329b) relative to when a motion for new trial is to be treated as having been overruled by operation of law where no affirmative action is taken by the court, in instances where the decision on the motion has been postponed by written agreement as provided by subdivision 3.

The motion to dismiss is overruled.

Judgment for damages in this case grew out of a pedestrian-motor vehicle collision which occurred October 8, 1957. Bradley Graves, a minor, then 6 years of age, son of T. M. Graves, ran across a highway south of the City of Arlington, Texas and was struck by defendants' truck. It was contended that he sustained serious and permanent injuries as the result. Suit was filed in 1959.

The day of the collision the child was carried to a doctor and then to a hospital in Fort Worth where he remained overnight. He was unconscious or semiconscious for about 16 hours. While in the hospital he was attended by a Dr. Smith, Dr. Brentlinger, and Dr. Hardey. There is no evidence in the record of any medical care of the child after he left the hospital and prior to the time suit was filed. This suit was filed on October 7, 1959. On October 18, 1959, he was sent by the Graves' attorney to Dr. Gerald King of Fort Worth for an examination. X-rays were taken. They were negative. Audio tests were performed and the child's hearing was found to be good. Visual acuity in the right eye was 20/70 and in the left eye 20/25. He was found unsteady in the balancing tests. His speech showed some pathological changes in that he tended to slur some of his words and phrases. Dr. King deemed him "unusually nervous and fidgety" for an 8 year old boy.

Dr. King referred the child to a Dr. Gardiner with the request that an electroencephalogram examination be made. An electroencephalogram is a test made of brain waves. In making the test electrodes are placed in different areas over the head. From the test a qualified examiner can tell if there is brain damage, tumor or some disease of the brain. The test on young Graves was run by the Terrell Laboratories and "read" by Dr. Gardiner. A written "report" containing Dr. Gardiner's "interpretation" of the finding as result of the test was prepared. This electroencephalogram report was mailed to Dr. King. It read as follows: " 'This is a moderately well organized record with a dominant frequency of about 10 per second. There is, however, considerable random and irregular slow wave activity of from 3 to 8 per second frequency present throughout the tracing in all leads. Some hemisphere asymmetry is noted in the record in the frontal leads and also in the temporal leads with the greater amount of irregularity being in the right hemisphere leads. There are some generalized runs of high amplitude sharp waves and some increased amplitude slow activity intermixed. These runs are of ½ to 1½ seconds in duration. There is a definite build-up on hyperventilation with an increase in the amount of high amplitude slow wave activity with long runs of 3 to 4 per second slow waves appearing in all leads. These do not have the appearance of definite paroxysmal discharges. There is a fairly rapid return to the basic pattern of the tracing following hyperventilation. With the exception of the previously described right hemisphere irregularity, there is no definite area of focal abnormality noted in the tracing.' * * * 'This is considered to be a mildly abnormal EEG. There are no definite diagnostic findings present, but some findings are suggestive of a generalized paroxysmal type of convulsive disorder.' "

During the course of interrogation of Dr. King he testified based upon his findings concerning the physical condition of Bradley Graves as of the time of his examinations on October 18, 1959, November 30, 1959, January 28, 1962, and based upon the electroencephalogram. He was of the opinion that the subject suffered at the time of the accident "a cerebral concussion with cerebral edema and that he is having a typical syndrome that we call post-concussion syndrome". He further stated his opinion that said condition, and the child's accompanying headaches, would be permanent or at least would persist for a long period of time.

■ Such testimony was objected to on the ground that the opinion was based upon unauthenticated data constituting "hearsay". The objection was overruled. There was no assignment of error presented to the trial court based upon the reception of Dr. King's testimony and no point of error founded thereon. The assignment of error was to the court's admitting into evidence the written report itself, upon which Dr. King in part based his opinion as to the disability of Bradley Graves. This was the assignment upon which the point of error was based. The reception of the report was prior to the stage in the introduction of the testimony of Dr. King where his opinion was given. The objection to it was that it was an unauthenticated statement of findings and opinion on the part of a third person, constituting hearsay. Such it was in our opinion and such it unquestionably remained, since it was never authenticated and proven either as applied to the findings upon the electroencephalogram examination or as applied to Dr. Gardiner's opinion based thereupon.

■■ Evidence of a statement made out of court, when such evidence is offered for the purpose of proving the truth of such previous statement, is inadmissible as hearsay. McCormick & Ray, Texas Law of Evidence, 2nd Ed., p. 559, "The Hearsay Rule (The Nature of Hearsay)", sec. 781, "Statement of the Rule". When a document offered in evidence contains a written assertion by someone not a witness, the

principle having application is the same as though it was testimony of said third person's oral assertion. The two chief obstacles, want of oath and cross-examination, remain the same. Consequently a written statement as to the existence of some fact, as, for example, a medical or other treatise, is not admissible to prove that fact. McCormick & Ray, Texas Law of Evidence, 2nd Ed., p. 574, "The Nature of Hearsay", sec. 790, "Writings—Statements in Writings". A very recent case in which the rule was applied, and in which it was held to be reversible error for the trial court to allow one physician to read in evidence a medical report of another, was Cross v. Houston Belt & Terminal Railway Company, 1961 (Tex.Civ.App., Houston), 351 S.W.2d 84, writ refused, n. r. e.

■ From the brief of Graves it appears that his contention is that the error, which seems to be admitted, does not amount to reversible error in view of T.R.C.P. 434, "If Judgment Reversed", wherein it is provided that no judgment shall be reversed on the ground that the trial court has committed an error of law in the course of the trial, unless the appellate court shall be of the opinion that the error complained of amounted to such a denial of the rights of the appellant as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case. In this respect Graves contends that the electroencephalogram report was favorable to Atkins and his driver and had a mild and sustaining effect helpful to them in light of Dr. King's insistence that the injury was severe and permanent.

We cannot agree. Dr. King stated an opinion relative to young Graves' disability which to a learned person would perhaps

appear more serious than the electroencephalogram and Dr. Gardiner's opinion thereupon would warrant, yet we believe that the lay personnel making up at least the greater part of the jury would not have so concluded. Dr. King testified that his opinion was based in part thereon. The report contained some medical terms which would be rather frightening to one without any special training in medicine, particularly when the examination made involved a study of "brain waves" to determine "brain damage", and when the medical terms were generally unexplained. This was true in the case before us. Furthermore, we have the testimony of two jurors, on the hearings held on the motion for new trial, to the effect that in arriving at the amount of damages for which their verdict was returned they took into consideration, among other things, the electroencephalogram. We are of the opinion that the error is reversible error even under the application of tests to be made under the provisions of T.R.C.P. 434.

We have examined the additional points of error presented to us. As to one we would sustain the contention that as applied to "future medical expenses" the judgment is excessive in that the maximum amount supported by the evidence was $825.00, while the amount found and awarded by the judgment is for a much greater amount. We deem the error immaterial, however, for there must be another trial in view of what we have heretofore stated. All other points of error are without merit and are severally overruled. Were our opinion to the contrary the matters that are contended to amount to error are not such as will be likely to occur in a subsequent trial.

Judgment is reversed. The cause is remanded for a new trial.